UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                             :

**CARLOS CARRION,**

                             :        **OPINION AND ORDER**

              **Petitioner,**

                             :        **04 Civ. 1034 (SAS)**

      **- against -**

                             :

**JOSEPH T. SMITH, Superintendent of
Shawangunk Correctional Facility,**     :

                **Respondent.**     :
-------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I. INTRODUCTION

Carlos Carrion ("Carrion" or "petitioner"), initially proceeding pro se, brought a habeas petition under 28 U.S.C. § 2254 ("section 2254"), which was received by this Court's Pro Se Office on December 5, 2003. Petitioner was given sixty days in which to file an amended petition demonstrating why his petition should not be dismissed as time-barred.[1] Carrion then filed an Amended Petition in which he argued, *inter alia*, that he was "denied his Sixth Amendment right to effective assistance of counsel due to his trial attorney's failure to fully inform and advise him concerning the prosecution's pre-trial plea offer, and the hazards

---

[1] *See* Order dated February 9, 2004 by former Chief Judge Michael B. Mukasey.

petitioner faced if he proceeded to trial."[2]

After being assigned to this Court, the petition was referred to Magistrate Judge Frank Maas for the purposes of conducting an evidentiary hearing and issuing a Report and Recommendation ("R&R" or "Report"). Marjorie Smith was assigned under the Criminal Justice Act to represent petitioner during the hearing and thereafter.

On February 6, 2006, the Magistrate Judge held an evidentiary hearing to explore the pre-trial discussions between petitioner and his trial attorney, Roy R. Kulcsar, regarding the advisability of a plea. At the hearing, Carrion and Kulcsar testified. After the hearing, Smith filed a post-hearing memorandum on petitioner's behalf. On January 25, 2007, the Magistrate Judge issued a R&R in which he found that Carrion had received constitutionally effective assistance of counsel.[3] In a lengthy memorandum, Carrion objected to

---

[2]    *See* Amended Petition Under 28 U.S.C. § 2254 For Writ Of Habeas Corpus By A Person In State Custody ("Petition"), Ground II. Because I am granting Carrion's ineffective assistance of trial counsel claim, I need not address the other grounds raised in the Petition.

[3]    *See* R&R at 32 ("In sum, while Mr. Kulcsar's advice may have left something to be desired, Carrion is not entitled to have his sentence set aside based upon ineffective assistance of counsel.").

the R&R in its entirety.[4]  Respondent submitted a response to petitioner's

Objections in which he asks this Court to adopt the R&R in full and dismiss the

instant petition without issuing a certificate of appealability.[5]

 After reviewing the transcript of the evidentiary hearing and the R&R

in detail, I respectfully disagree with the conclusions reached by the Magistrate

Judge regarding the effectiveness of Kulcsar's representation.  Accordingly, I

hereby grant Carrion's petition and afford him the remedy fashioned herein.

## II.  LEGAL STANDARDS

### A.  Section 2254 Standard

 This petition is governed by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA").  The AEDPA provides that a federal court can

grant a writ of habeas corpus to a state prisoner only if the state court's denial of

relief "was contrary to, or involved an unreasonable application of, clearly

---

 [4]  *See* Petitioner's Objections to the Magistrate Judge's Report ("Objections").
Although Carrion objected to the R&R in its entirety, his Objections focus solely
on the Magistrate Judge's recommendation that his ineffective assistance claim be
denied.  *See id.* at 1 n.1 ("Petitioner also objects to the Magistrate Judge's
Recommendation that his ineffectiveness of appellate counsel; his Sixth
Amendment right to be present at all material proceedings; and his Eighth
Amendment sentencing claim be denied.  As to these claims, Petitioner relies on
the arguments contained in his . . . Memorandum in Support of Traverse,
submitted 12/15/04.").

 [5]  *See* Memorandum of Law dated March 15, 2007.

established Federal law, as determined by the Supreme Court of the United States."[6] As explained by the Supreme Court, a state-court decision is "contrary to" clearly established federal law in the following instances:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.[7]

With regard to the "unreasonable application" prong, the Supreme Court has stated that

> a state-court decision can involve an "unreasonable application" of this Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.[8]

---

[6] 28 U.S.C. § 2254(d)(1).

[7] *Williams v. Taylor,* 529 U.S. 362, 405 (2000).

[8] *Id.* at 407.

4

In order for a federal court to find a state court's application of

Supreme Court precedent to be unreasonable, the state court's decision must have

been more than incorrect or erroneous: "[t]he state court's application of clearly

established law must be objectively unreasonable."[9] This standard "'falls

somewhere between merely erroneous and unreasonable to all reasonable

jurists.'"[10] While the test requires "'[s]ome increment of incorrectness beyond

error, . . . the increment need not be great; otherwise *habeas* relief would be

limited to state court decisions so far off the mark as to suggest judicial

incompetence.'"[11] Thus, "a federal habeas court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state-

court decision applied clearly established federal law erroneously or incorrectly.

Rather, that application must also be unreasonable."[12]

---

[9] *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). *Accord Williams*, 529 U.S. at 409; *Harris v. Kuhlman*, 346 F.3d 330, 344 (2d Cir. 2003).

[10] *Overton v. Newton*, 295 F.3d 270, 276 (2d Cir. 2002) (quoting *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir. 2000)).

[11] *Id.* (quoting *Francis v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (emphasis in original)).

[12] *Williams*, 529 U.S. at 411.

5

## B. Ineffective Assistance of Counsel - In General

The Sixth Amendment guarantees a fair trial and competent counsel in all criminal prosecutions.[13]   The Sixth Amendment "'stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not still be done.'"[14]   To prove that counsel was constitutionally ineffective, a petitioner must satisfy the two-part test established in *Strickland v. Washington*.[15] A petitioner must first show that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms."[16] The second prong requires a petitioner to "affirmatively prove prejudice," *i.e.*, to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[17] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[18]

---

[13]   *See* U.S. Const. amend. VI.

[14]   *Gideon v. Wainwright*, 372 U.S. 335, 343 (1963) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938)).

[15]   *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[16]   *Id.* at 688.

[17]   *Id.* at 694.

[18]   *Id.*

In analyzing a claim that counsel's performance fell short of

constitutional standards, the court "must 'indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance.

. . .'"[19]  As explained by the Supreme Court,

> strategic choices made after thorough investigation of law
> and facts relevant to plausible options are virtually
> unchallengeable; and strategic choices made after less than
> complete investigation are reasonable precisely to the extent
> that reasonable professional judgments support the
> limitations on investigation.[20]

Moreover, "[i]n assessing the attorney's performance, a reviewing court must judge

[her] conduct on the basis of the facts of the particular case, 'viewed as of the time

of counsel's conduct,' and may not use hindsight to second-guess [her] strategy

choices."[21]

The Supreme Court has held that the two-part *Strickland* test applies

to ineffective assistance of counsel claims arising out of the plea process.[22]  A

---

[19]  *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).

[20]  *Strickland*, 466 U.S. at 690-91.

[21]  *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690).

[22]  *See Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985) (holding that the voluntariness of a guilty plea depends on the adequacy of counsel's advice).

7

defendant is entitled to the effective assistance of counsel in contemplation and negotiation of a guilty plea.[23] Furthermore, *Strickland's* "strong presumption" that counsel has a acted in a professionally competent manner is of limited relevance to the guilty plea context because plea advice usually does not implicate an attorney's strategic decision-making.[24] There "can be no appropriate strategic reason for failing to inform" a client of the facts and circumstances relevant to the plea decision; counsel has a professional obligation to adequately inform his client about the considerations that are relevant to his client's decision to accept or deny a plea and provide some advice regarding this "crucial decision."[25]

---

[23] *See Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948) ("Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered."); *Davis v. Greiner*, 428 F.3d 81, 88 (2d Cir. 2005) ("[C]ounsel has a professional obligation to adequately inform [his] client about the considerations that are relevant to [his] client's decision to accept or deny a plea bargain."); *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003) (defense attorneys have "a constitutional duty to give their clients professional advice on the crucial decision of whether to accept a plea offer from the government").

[24] *Cf. Davis*, 428 F.3d at 90 ("Our case law acknowledging that attorneys sometimes have strategic reasons for decisions that are later proven to be unsuccessful is inapposite in this case because [the attorney] could have had no appropriate strategic reason for failing to inform his client of the risks of proferring.").

[25] *Pham*, 317 F.3d at 182-83.

## C. Ineffective Assistance of Counsel - Plea Offers

The Second Circuit first addressed the question of the adequacy of counsel's representation in the context of a plea offer in *Boria v. Keane*.[26] In *Boria*, the prosecution offered a very favorable plea bargain to the defendant wherein he would serve one to three years as opposed to the fifteen to twenty-five he was facing if convicted of a Class A-1 felony.[27] The court ruled that trial counsel's failure to give any advice concerning the acceptance of the plea bargain was constitutionally inadequate, noting that "[e]ffective assistance of counsel includes counsel's informed opinion as to what pleas should be entered."[28]

In reaching this holding, the court quoted the Model of Code of Professional Responsibility, Ethical Consideration 7-7 (1992), which states: "A defense lawyer in a criminal case has the duty to advise his client fully on *whether a particular plea to a charge appears to be desirable*."[29] The court also quoted

---

[26]  99 F.3d 492, 496 (2d Cir. 1996) ("There seems to be no Second Circuit decision dealing with the precise question of a criminal defense lawyer's duty when a defendant's best interests clearly require that a proffered plea bargain be accepted, but the defendant, professing innocence, refuses to consider the matter.").

[27]  *See id.* at 494-95.

[28]  *Id.* at 497.

[29]  *Id.* at 496 (emphasis in original).

from Anthony G. Amsterdam, *Trial Manual 5 for the Defense of Criminal Cases* (1988), as follows:

> The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in any criminal cases. This decision must ultimately be left to the client's wishes. . . . But counsel may and *must* give the client *the benefit of counsel's professional advice on this crucial decision.*[30]

The issue next arose in *United States v. Gordon*, where it was alleged that defense counsel grossly underestimated his client's sentencing exposure.[31] In addition to recapitulating its earlier ruling in *Boria*, the court noted that "'[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea will often be crucial to the decision whether to plead guilty.'"[32] The *Gordon* court held that "[b]y grossly underestimating Gordon's sentencing exposure in a letter to his client, [defense counsel] breached his duty as a defense lawyer in a criminal case 'to advise his client fully on whether a particular plea to a

---

[30]  *Id.* at 496-97 (emphasis in original).

[31]  156 F.3d 376, 377 (2d Cir. 1998) (per curiam).

[32]  *Id.* (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)). In *Day*, where the defendant claimed that he received constitutionally inadequate advice regarding his sentencing exposure under the United States Sentencing Guidelines, the court held that "if Day is correct that he was seriously misled about his sentence exposure when the likelihood of conviction was overwhelming, he received ineffective assistance of counsel." *Day*, 969 F.2d at 44.

charge appears desirable.'"[33]

The next significant case is *Purdy v. United States,* a case which is factually distinguishable from *Boria.*[34]   In *Purdy*, the defendant claimed he was denied the effective assistance of counsel because his attorney "failed to specifically and explicitly advise him to accept a guilty plea."[35]   The lower court found that defense counsel

> had substantially communicated the government's plea offers to Purdy; . . . had adequately informed Purdy about the consequences of pleading guilty and cooperating with the government; had stressed the strength of the government's case; and had urged Purdy to carefully weigh his options of pleading guilty and going to trial.[36]

Under these circumstances, the Second Circuit found that the defendant failed to show that his constitutional right to effective assistance of counsel was violated.[37]

The court began its analysis by noting that the "performance inquiry is contextual; it asks whether defense counsel's actions were objectively reasonable

---

[33]   156 F.3d at 380 (quoting *Boria*, 99 F.3d at 496 (quotation marks and citation omitted)).

[34]   208 F.3d at 47.

[35]   *Id.* at 43.

[36]   *Id.* at 44.

[37]   *See id.* at 49.

considering all circumstances."[38] In this vein, the court noted that "[counsel's

conclusion as to how best to advise a client in order to avoid, on the one hand,

failing to give advice and, on the other coercing a plea enjoys a wide range of

reasonableness because '[r]epresentation is an art,' and '[there are countless ways

to provide effective assistance in any given case.'"[39] The court ultimately held that

"reasonable professional conduct does not under all circumstances require a lawyer

to give an explicit opinion as to whether a client should take a plea offer."[40]

This holding was based, in part, on recognizing the limitations of

*Boria*, which the court readily distinguished from the case before it. The court

noted:

> The *Boria* court's task was to determine the parameters of
> "a criminal defense lawyer's duty when a defendant's best
> interests clearly require that a proffered plea bargain be
> accepted, but the defendant, professing innocence, refuses
> to consider the matter." . . . [W]e ultimately held only that
> under the circumstances of that case, Boria's lawyer had
> failed to adequately advise his client. We held that a
> defense attorney must do more than Boria's counsel did; we

---

[38] *Id.* at 44. As part of counsel's professional advice as to whether to plead
guilty, counsel "should usually inform the defendant of the strengths and
weaknesses of the case against him, as well as the alternative sentences to which
he will most likely be exposed." *Id.* at 45.

[39] *Id.* at 45 (quoting *Strickland*, 466 U.S. at 693, 689).

[40] *Id.* at 48.

did not hold that a lawyer in that position must do
everything Purdy now proposes.[41]

The court went on to distinguish *Boria* on the following grounds: "Boria's defense

counsel not only failed to give an ultimate opinion as to the wisdom of a plea, but

also 'never gave his client any advice or suggestion as to how to deal with the

People's offered plea bargain;'" "unlike Boria, Purdy's best interests did not

necessarily demand a guilty plea;" and, finally, it was far from clear that Purdy

refused to consider the possibility of a plea.[42] The court concluded, with regard to

*Boria*, that it is "unwise to read *Boria* to have established a *per se* rule that defense

counsel must always expressly advice the defendant whether to take a plea offer."[43]

Thus, *Purdy* is not so much a partial retraction of *Boria* but rather a case that

presented a materially different set of facts than that considered in *Boria*.

## III.  DISCUSSION

In deciding whether to adopt the Report, I must address each of the

following issues: (1) whether Kulcsar advised Carrion of the sentence he faced if

he were convicted at trial; (2) whether Kulcsar adequately dispelled Carrion's

---

[41]  *Id.* at 46 (quoting *Boria*, 99 F.3d at 496).

[42]  *Id.* at 47 (quoting *Boria*, 99 F.3d at 498).

[43]  *Id.* at 48.

misguided belief that he had a viable legal defense to the criminal charges; and (3) whether Kulcsar's advice regarding the advisability of the plea offer, under the circumstances, was sufficiently vigorous to ensure constitutionally adequate representation. Before summarizing the hearing testimony relevant to each of these issues, the following background information is provided.

## A. State Proceedings and Subsequent Procedural History

On November 13, 1991, the Manhattan North Narcotics Major Case Unit of the New York City Police Department conducted a surveillance and stop operation in the Bronx.[44] As part of this operation, detectives followed a livery cab in which Carrion was traveling.[45] The detectives eventually turned on their sirens and directed the cab to stop, at which point Carrion jumped out of the cab, holding a gun and a shoulder bag.[46] Carrion began firing at the detectives while he fled on foot.[47] The detectives returned fire and shot at Carrion who, after being struck by several bullets, fell to the ground.[48] At the scene, police officers recovered a

---

[44]   *See* R&R at 2.

[45]   *See id.* at 3.

[46]   *See id.* at 4.

[47]   *See id.*

[48]   *See id.* at 5.

**14**

shoulder bag containing five kilograms of cocaine, a .9 millimeter semiautomatic pistol, and a .38 caliber revolver.[49]

Carrion was indicted on February 13, 1992.[50] On October 19, 1993, after a trial in Supreme Court, New York County, the jury returned a verdict of guilty on one count of Criminal Possession of a Controlled Substance in the First Degree, five counts of Attempted Murder in the First Degree, one count of Criminal Use of a Firearm in the First Degree, two counts of Criminal Possession of a Weapon in the Third Degree, and one count of Reckless Endangerment in the First Degree.[51] On December 10, 1993, the state-court judge, Justice Leslie Crocker Snyder, sentenced Carrion to a total prison term of 125 years to life.[52]

Carrion appealed the judgment of conviction to the Appellate Division, First Department.[53] The First Department affirmed Carrion's conviction on June 22, 2000.[54] On November 21, 2000, the New York Court of Appeals

---

[49] *See id.*

[50] *See id.* at 6.

[51] *See* Petition ¶¶ 1, 5.

[52] *See id.* ¶¶ 3, 4.

[53] *See id.* ¶ 10.

[54] *See People v. Carrion*, 710 N.Y.S.2d 892 (1st Dep't 2000). In his direct appeal, Carrion did not raise an ineffective assistance of trial counsel claim.

denied Carrion's application for leave to appeal the decision of the First Department.[55] Carrion then filed a pro se motion to vacate his conviction pursuant to section 440.10 of the New York Criminal Procedure Law.[56] In his section 440.10 motion, Carrion alleged that Kulcsar provided ineffective assistance "for failing to adequately explain the prosecution's pre-trial plea bargain offer and the severity of consequences if convicted on all counts after jury trial."[57] Justice Snyder denied Carrion's motion, finding that he had been ably represented by trial counsel.[58] Although this holding related to counsel's trial tactics, Justice Snyder also rejected Carrion's "remaining arguments . . . for the reasons set forth by the People in their response."[59] The First Department denied Carrion leave to appeal

---

[55]  *See* Petition ¶ 10.

[56]  *See id.* ¶ 12.

[57]  *Id.* Carrion also alleged that Kulcsar's tactical decisions at trial constituted ineffective assistance.

[58]  *See* 12/14/01 Order, Ex. B to Petition, at 3 ("In analyzing the circumstances of this case, the court finds that under both the federal and state standards, the defendant received effective representation.").

[59]  *Id.* Despite its conclusory nature, this holding constitutes a decision on the merits by a state court. Accordingly, the deferential standard set forth in the AEDPA is applicable. In his Report, the Magistrate Judge does not expressly state that the state court's ruling on Carrion's 440.10 motion was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. However, such holding is implicit given the Magistrate Judge's resolution of the underlying substantive

the denial of his section 440.10 motion on May 30, 2002.[60]

## B.    The Evidentiary Hearing[61]

### 1.    Carrion's Testimony

Carrion testified that he met with Kulcsar while he was being treated

for multiple gunshot wounds at Bellevue Hospital.[62]  During this meeting, Kulcsar

informed Carrion that the prosecutor had offered him a plea bargain of ten years to

life imprisonment.[63]  When Carrion asked Kulcsar what he thought about the offer,

Kulcsar responded that "he thought it was a good offer" but that it was Carrion's

---

issue, namely, ineffective assistance of counsel.

[60]    *See* R&R at 14.

[61]    Because I am relying on the evidentiary hearing conducted by the
Magistrate Judge, I have not made any independent findings with regard to
witness credibility, as such findings are prohibited unless I hold my own hearing.
*See Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999) ("[I]t appears that a
district judge should normally not reject a proposed finding of a magistrate judge
that rests on a credibility finding without having the witness testify before the
judge.").

[62]    *See* Transcript of 2/6/06 Hearing ("Tr.") at 8.  Carrion was being treated at
the hospital for multiple gunshot wounds to his chest, back and legs, which he
sustained upon his arrest.  He underwent two surgeries and spent approximately
two weeks in the Intensive Care Unit.  *See* Affidavit #2 Opposing Report and
Recomendation [sic] to the Honorable Shira A. Scheindlin ("Opp. Aff. 2") ¶ 1.
Although Carrion testified that he was treated at Bellevue Hospital, his opposing
affidavit states that he was admitted to Harlem Hospital, which is the hospital cited
by the Magistrate Judge in his Report.  *See* R&R at 26.

[63]    *See* Tr. at 9.

decision whether to accept it.[64] Carrion stated that other than the meeting at Bellevue Hospital, he had no other discussions with Kulcsar regarding the plea offer.[65] Carrion further testified that Kulcsar never informed him of the sentence he would receive if convicted of the criminal possession of a controlled substance charge, the least serious crime with which he was charged.[66] In addition, Carrion stated that Kulcsar never told him that he could receive a sentence of 125 years to life for the charges he was facing.[67] According to Carrion, if he knew he was facing 125 years to life, he would have accepted the plea offer of ten years to life "[b]ecause there is a big difference between 10 to life and 125 years to life."[68]

Carrion also described what he thought was a legal defense to the charges against him, namely, that the police shot him in the back after he was already on the ground.[69] At first, Carrion testified that when he discussed this

---

[64]  *Id.*

[65]  *See id.* at 12.

[66]  *See id.* at 13. Carrion admitted to Kulcsar that at the time of his arrest, he was in possession of five kilograms of cocaine. *See id.* The mandatory minimum sentence for this A-1 felony is fifteen years to life imprisonment. *See id.* at 77.

[67]  *See id.* at 14.

[68]  *Id.* at 15.

[69]  *See id.* at 33. *See also id.* at 35 ("I told them if I could prove that the police was engaged in misconduct, at that time, I understand that could be a legal defense

**18**

misguided belief with Kulcsar, Kulcsar did not respond.[70] On cross-examination, however, Carrion conceded that he did not recall what, if anything, Kulcsar had said about his proposed legal defense.[71] It was because of Carrion's confidence in this so-called legal defense that made him decide not to accept the ten year plea offer, even though Kulcsar told him that he thought it was a "good offer."[72] Furthermore, Carrion testified that he remembered Kulcsar saying the following to the state-court judge: "The defendant's primary focus in going to trial was – I think it remains his belief that the paralyzing injuries that he suffers were inflicted upon him."[73]

### 2. Kulcsar's Testimony

With regard to whether Kulcsar recommended to Carrion that he take the plea offer, Kulcsar testified as follows:

---

in the charges that I was facing.").

[70] *See id.* at 33-34. Carrion had only one conversation with Kulcsar about this legal defense and, after that, never brought it up again. *See id.* at 34.

[71] *See id.* at 35.

[72] *Id.* at 36 (Carrion responded "Yes" when asked whether "it was your belief that you had a legal defense to those charges that made you decide not to accept a 10-year offer, correct?").

[73] *Id.* at 42. Carrion conceded that he did not tell the state-court judge that Kulcsar allowed him to go on believing that he had a legal defense. *See id.*

Well, I think I told you at the meeting we had that I really, as a matter of practice, don't recommend to clients whether they take pleas or not. I've done my best through the years to advise clients of the consequences of going to trial, and since most of my practice for the last, I mean more than 10 years has been federal practice, where the guidelines up until recently were such a formidable aspect of trials and decisions, that it's hard for me to recall going back prior to that.

And in this case, what we would have discussed in the sense of recommending a plea. But I would just say that as a basic rule, I have not recommended a defendant take a plea or not take a plea. I've tried my best to go through the consequences of sentencing and being convicted and all of that, and obviously the first part of any of this if for a defendant to say I'm guilty of something. So I would say that I don't - - *I don't recall recommending to Mr. Carrion that he take a plea.* I think that's the short answer to your question.[74]

After admitting that he did not advise Carrion to take the plea offer,[75] Kulcsar

---

[74]    *Id.* at 57-58 (emphasis added).

[75]    *See id.* at 86 ("Q. Mr. Kulcsar, do you have any recollection in which you discouraged him from going to trial? A. I don't remember any discussion with Mr. Carrion that would have related to my encouraging or discouraging him from going to trial. Q. It's your general practice, isn't it, that you don't recommend that a defendant accept or not accept a plea offer? That you leave it up to them? A. Yes, I think that's a fair statement. Yes, that's a fair statement." Q. Do you recall ever telling Mr. Carrion that because of your knowledge of Judge Crocker Snyder's harsh sentencing in cases like this it was a bad idea for him to go to trial. A. I don't remember having any discussion with Mr. Carrion concerning the fact of Judge Snyder's harsh sentencing practices as impacting on his decision to go to trial, whether he should or should not go to trial. I don't remember having that type of discussion.").

stated that he had no recollection as to whether he discussed the minimum sentence Carrion could receive on the drug possession charge, if convicted.[76] As to the overall sentence Carrion could have received, the following colloquy ensued:

> Q.      Do you recall any discussion with Mr. Carrion in which you advised him that he could face a sentence of upwards of a hundred years if he were convicted of one or mor[e] [of] the charges against him?
>
> A.      Absolutely not.[77]

With regard to the strength of the People's case against Carrion, Kulcsar stated as follows:

> THE COURT:      Did you convey your vew as to the strength of the case to Mr. Carrion prior to trial?
>
> THE WITNESS:   I don't remember having a discussion with him evaluating or presenting the case from a perspective of whether it was a strong case or not a strong case as opposed to what we expected the evidence proffered by the prosecution would be.[78]

---

[76]   *See id.* at 59 ("Again, I don't have a recollection of discussing the narcotics case separate and apart from anything else we discussed.").

[77]   *Id.* at 61. Kulcsar later conceded that he had no independent recollection of any specific conversations he had with Carrion regarding the sentencing ranges for attempted murder and gun possession. *See id.* at 77.

[78]   *Id.* at 84.

When Kulcsar was asked whether Carrion told him of his belief that

his being shot by police while on the ground was a legal defense to all of the

charges against him, Kulcsar equivocated with the following response:

> I don't think we discussed it from the [perspective] of it
> being a defense to the charges against him. I think we
> discussed it from a [perspective] of the fact that the
> allegations against him concerning his attempted murders of
> police officers and the shooting was significantly different
> from the police version of the incident. I mean, to that
> extent as a defense, yes. The mere fact that he was shot and
> paralyzed we didn't discuss that as some kind of a defense.[79]

## C.  The Analysis of the Magistrate Judge

With regard to Carrion's complaint that Kulcsar failed to advise him

of the maximum sentence he faced upon conviction, the Magistrate Judge found

"on the basis of the testimony at the evidentiary hearing alone . . . that Mr.

Kulcsar's advice to Carrion was sufficient – albeit barely – to meet the *Strickland*

standard."[80] For several reasons, I respectfully disagree with this conclusion.

*First*, the Magistrate Judge cited a transcript of Carrion's bedside arraignment at

Harlem Hospital in which Justice Snyder warned Carrion's then-counsel, in

---

[79]  *Id.* at 82. Earlier in the hearing, Kulcsar stated that Carrion's being shot
while on the ground and paralyzed "was the focus point to our discussions and the
efforts we made at trial." *Id.* at 58.

[80]  R&R at 27.

Carrion's presence, that he was likely to be convicted after trial and would probably face a substantial sentence. This transcript was produced after the evidentiary hearing, with no input from Carrion as to his condition at the time of the arraignment or his ability to comprehend the proceedings. Yet the Magistrate Judge quoted from this transcript as follows:

> We also have mand[a]tory sentencing in this State as to the most serious crimes. And that mand[a]tory minimum for conviction of anyone [sic] of those A-1 felonies is 15 years to life up to 25 years to life as to each separate incident. They can, of course, run consecutively. So, your client could theoretically do a couple of hundred years.[81]

Although the Magistrate Judge stated that "[t]here is no need to reopen the record[,]"[82] the fact that he quoted extensively from the arraignment transcript indicates that he relied upon it, to some degree, in reaching his conclusion that the *Strickland* standard was satisfied. Such reliance, however, is misplaced in light of Carrion's second affidavit in support of his Objections to the R&R in which he states that as a result of the pain he was suffering and the medications he was given, he could not focus on or recall any of the comments made by Justice Snyder

---

[81] *Id.*

[82] *Id.* The Magistrate Judge declined to reopen the record after Carrion's attorney requested that he either disregard the transcript or permit the filing of a supplemental affidavit explaining Carrion's physical and mental condition at the time of arraignment. *See id.*

regarding the severity of the sentence he faced.[83]

*Second*, although Kulcsar could not recall his advice to Carrion, the

Magistrate Judge credited Kulcsar's testimony as to what he described as his

"established practice."

> I find, on the basis of Mr. Kulcsar's established practice,
> that he advised Carrion of the consequences of going to
> trial, including the possibility of a very lengthy minimum
> sentence, which Mr. Kulcsar knew from his prior
> experience with Justice Snyder was a likely outcome in the
> event Carrion was convicted on the A-1 counts.[84]

Finally, the Magistrate Judge considered other sources of information in imputing

to Carrion knowledge of the sentence he faced. In his R&R, the Magistrate Judge

specifically credited Carrion's testimony that "other 'prisoners' had told him prior

to trial that the Justice might impose a term of 250 to 300 years in jail if the jury

---

[83]   Opp. Aff. 2 ¶ 5. *See also id.* ¶ 4 ("As a result I was experiencing confusion,
somnolence, dizziness and drowsiness and did not understand nor comprehended
[sic] the legalese jargon being expressed at this arraignment hearing and had
absolutely no idea what [was] said or going on.").

[84]   R&R at 28 (citing Tr. at 58 ("I do recall discussing a plea offer with him,
and I would reasonably conclude that within the framework of that discussion, I
would have discussed with him any aspects relating to sentencing."), 78 (Kulcsar
responding "Yes" when asked: "Within your practice, sir, would you have
discussed the sentencing ranges for the charges Mr. Carrion faced in the
indictment pending against him?")).

returned a guilty verdict."[85]  Consideration of such sources of information sidesteps the crucial question of whether counsel discussed the applicable sentencing range with the defendant, not whether the defendant had independent knowledge of that range from other sources.  For these reasons, I reject the Magistrate Judge's conclusion that Kulcsar adequately advised Carrion of his maximum sentencing exposure.

The second question presented with respect to the plea offer is whether Kulcsar's advice concerning its advisability was sufficiently robust.[86]  In his Report, the Magistrate Judge cited *Purdy v. United States*, which states that counsel should consider the following factors in deciding how to advise a client with regard to a plea offer:

> the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea . . . , whether the defendant has maintained his innocence, and the defendant's comprehension of the

---

[85]  *Id.* (citing Tr. at 14 ("I spoke to prisoners, and they [sic] answered varied from two years to life to three years to life to 250 and to 300 years.")).

[86]  The Magistrate Judge acknowledged that "[t]he gross disparity between the People's relatively lenient plea offer and the sentence that Justice Snyder was likely to impose in the event of a conviction indicates that greater direction from Mr. Kulcsar concerning the advisability of a plea would have been desirable." R&R at 30.

various factors that will inform his plea decision.[87]

Although the Magistrate Judge noted that two of the *Purdy* factors suggest that

Kulcsar "should have weighed in more heavily in favor of a guilty plea," he found

that Kulcsar's failure to do so did not constitute ineffective assistance, nor did it

prejudice Carrion.[88]   Once again, I respectfully disagree with the Magistrate Judge.

## D.    Ineffective Assistance Under the Circumstances Presented

The instant case is quite similar to that considered in *Boria v. Keane.*

Other than Kulcsar's lukewarm endorsement that the proffered plea bargain was a

"good offer," he did nothing to persuade his client to take what was obviously a

very beneficial deal.[89]   Moreover, Kulcsar was aware, and so informed Justice

Snyder, that the events responsible for causing his client's paralysis was an

---

[87]   208 F.3d 41, 45 (2d Cir. 2000).

[88]   R&R at 29. *See also id.* at 28-29 ("In keeping with his usual practice,
however, Mr. Kulcsar did not press Carrion to take the plea, reasoning that this
was a matter best left to his client to decide. From Mr. Kulcsar's testimony, it
seems clear that his customary reticence was based on a fear that he might be
accused of exerting undue influence on clients who decided to plead guilty.").
While this Court is mindful of the "Scylla of inadequate advice and the Charybdis
of coercing a plea," *Purdy*, 208 F.3d at 45, an attorney cannot delegate to his client
such an important decision without providing some meaningful input.

[89]   The fact that the plea offer of ten to life was less than the fifteen to life
mandatory minimum on the drug charge makes Kulcsar's failure to vigorously
advise his client to take the plea even more troubling.

impediment to his client taking the plea because his client believed that these events established a defense to all of the charges he was facing. But Kulcsar made no efforts to explore this area with his client in order to dispel his belief that the shooting established a viable defense to the charges against him. Finally, Kulcsar must have been aware that the People had an open and shut case against his client, at least with respect to the drug possession charge, which carried a mandatory minimum fifteen year penalty. In sum, only a constitutionally deficient attorney would have failed to vigorously advise his client to take the plea. Under these circumstances, I find that Kulcsar's representation fell below the requirement for constitutionally effective assistance of counsel.

## E. Prejudice to Carrion

The second *Strickland* prong requires a showing of prejudice which, in the Second Circuit, requires "some objective evidence other than defendant's assertions."[90] "However, a significant sentencing disparity in combination with defendant's statement of his intention [to have pled guilty] is sufficient to support a prejudice finding."[91] Here, the disparity between the plea offer of ten years to life

---

[90] *Pham*, 317 F.3d at 182. *See also Gordon*, 156 F.3d at 381 ("This 'objective evidence' rule is consistent with our holding in *Boria*.").

[91] *Pham*, 317 F.3d at 182.

27

and the sentence imposed of 125 years to life is extremely large. Despite this

disparity, the Magistrate Judge found no prejudice, stating that

> Carrion had filed a civil suit in which he was contesting the
> police department's decision to use deadly force against
> him. At the sentencing, Mr. Kulcsar explained that but for
> Carrion's desire to establish in that suit that he was shot
> after he was already on the ground, Carrion would likely
> have pleaded guilty. (Tr. 1795). . . . Carrion was unwilling
> to plead guilty to all of the charges – as the People's plea
> offer required – because he did not want to prejudice his
> civil case by admitting that he was not simply attempting to
> flee, but knowingly had attempted to kill at least ten police
> officers to avoid his arrest and the seizure of a substantial
> quantity of cocaine from him. If, *as it appears*, the
> prospect of a substantial civil recovery was motivating
> Carrion, even the most heavy-handed of approaches *might
> not have* induced him to plead guilty.[92]

A close reading of the transcript page cited by the Magistrate Judge

reveals that rather than summarizing any statement from Kulcsar, he reached his

own conclusion regarding the impact of Carrion's civil suit on his willingness to

plead guilty. There is no mention of Carrion's civil suit at the cited page.

Furthermore, Kulcsar never testified that Carrion's civil suit was the impediment to

his pleading guilty. In sum, the conclusion reached by the Magistrate Judge is not

supported by Kulscar's actual testimony. Indeed, the only fair inference from

Kulcsar's testimony is that Carrion believed he had a legal defense to the charges

---

[92] R&R at 30-31 (emphasis added).

based on his injuries at the hands of the police.

> Q.    And did you indicate what your understanding was of the primary reason that Mr. Carrion wanted to go to trial?
>
> A.    Yes, yes.
>
> Q.    And what was that?
>
> A.    The primary reason was that he believed he was nearly assassinated and made a paraplegic by the police as a result of his being shot and his spine severed while he was lying on the ground. At which time he was not in possession of any weapon and didn't pose any threat to the police.
>
> Q.    And did you indicate your belief as to whether Mr. Carrion would have pled guilty if it were not for that primary reason that he wanted to go to trial?
>
> A.    I indicated that before Judge Snyder.[93]

With regard to the civil lawsuit, Kulcsar further testified:

> THE COURT:    Did you have any discussion with Mr. Carrion about what the effect of the guilty plea would be on the civil lawsuit that he had brought?
>
> THE WITNESS:    The only recollection I have is in looking at the memorandum that Miss Hickey just showed me that required him to allocute to the entire indictment, and admit the guilt of the whole indictment. And I remember that, and

---

[93]   *Id.* at 62-63.

> I can't tell you how, but I remember that somehow relating to the fact that there was a claim against the City or something like that. But also, I don't want to undermine the basic fact that I think Mr. Carrion sincerely believed that he was shot by the police while he was on the ground. I don't think his claim against the City was some kind of made up thing, that he was hoping to get a windfall from his paralysis.[94]

Kulcsar further distinguished Carrion's civil suit from his purported legal defense

when he stated the following:

> Q. Despite whatever conversation you had with Mr. Carrion about his claim involving the city, you nevertheless stated at sentencing that [i]f it had not been for his feeling that he had been wronged by being shot by the police while he was on the ground, that he would have pled guilty, correct?
>
> A. I remember saying that at the sentence, and, as I tried to indicate[] before, I don't want to convey the fact that there was something in Mr. Carrion's mind about filing that claim. I believe that he sincerely felt that he was shot while he was on the ground - -
>
> Q. It was your belief at the time of sentencing that he would have pled guilty had it not been for his concern about having been shot on the ground?
>
> A. That's what I said in front of Judge Snyder, so I'm sure that was my belief at the time I said it.[95]

---

[94]  *Id.* at 85.

[95]  *Id.* at 88-89.

The Magistrate Judge's conclusion concerning the impact of Carrion's civil suit was made without the benefit of Carrion's post-hearing affidavit. In that affidavit, Carrion states that he "was never motivated in refusing a plea with the notion of winning a law suit as inferred at the February 6, 2006 hearing (pgs. 81, 85-86). If such a plea [had] been offered I had no desire to 'roll the dice' with my life and liberty at stake."[96] Carrion states further that he "would have accepted the favorable plea had I been properly notified and advised by counsel that the minimum I faced was 15 years to life. It surely served my best interest to do so considering the overwhelming damning evidence and unfavorable odds that were against me at the time."[97] Given these assertions, coupled with the significant sentencing disparity, I find there to be sufficient objective evidence to support the conclusion that there is a reasonable probability that Carrion would have accepted the plea offer, if properly counseled by Kulcsar.[98]

---

[96] Affidavit #1 Opposing Report and Recommendation to the Honorable Shira A. Scheindlin ¶ 8.

[97] *Id.* ¶ 9.

[98] *See Gordon*, 156 F.3d at 381 ("We agree with the district court that such a disparity provides sufficient objective evidence – when combined with a petitioner's statement concerning his intentions – to support a finding of prejudice under *Strickland*.").

In sum, having found both inadequate representation and prejudice, the inevitable conclusion is that the state-court decision rejecting Carrion's ineffective assistance of counsel claim constitutes an unreasonable application of federal law.

## F.    The Appropriate Remedy

A district court has considerable discretion in fashioning an appropriate remedy in a habeas proceeding.[99]  Where there has been a finding of ineffective assistance of counsel, the remedy "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."[100]  Those "competing interests" include "the necessity for preserving society's interest in the administration of criminal justice."[101]   In interpreting *United States v. Morrison*, the Third Circuit has held that "a second opportunity to accept a plea agreement ought not to be automatic, but it does not follow that the relief of 'specific performance' is *never* appropriate."[102]

---

[99]   *See Day*, 969 F.2d at 47.

[100]   *United States v. Morrison*, 449 U.S. 361, 364 (1981).

[101]   *Id.*

[102]   *Day*, 969 F.2d at 47 (emphasis in original).  The Second Circuit quoted from *Day* in discussing the appropriate habeas remedy in a case where a defense attorney grossly underestimated his client's potential maximum sentence.  *See Gordon*, 156 F.3d at 381.

The appropriate remedy here is to give Carrion the benefit of the original plea offer and re-sentence him accordingly. I note that the plea offer was ten years to life which gives the state-court judge considerable discretion in imposing an amended sentence.

## IV.    CONCLUSION

For the reasons set forth above, Carrion's section 2254petition is granted and he is accorded the relief set forth above. The Clerk of the Court is directed to close this petition and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 22 , 2008

## - Appearances -

**For Petitioner:**

Marjorie M. Smith, Esq.
Law Office of Marjorie M. Smith
P.O. Box 234
Piermont, New York 10968
(845) 365-6335

**For Respondent:**

Mary C. Farrington
Assistant District Attorney
One Hogan Place
New York, New York 10013
(212) 335-9000