UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

CARLOS CARRION,

                    **Petitioner,**

    **- against -**

**JOSEPH T. SMITH, Superintendent of
Shawangunk Correctional Facility,**

                  **Respondent.**

------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**OPINION AND ORDER**

**04 Civ. 1034 (SAS)**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/11/09

## I.    INTRODUCTION

Approximately seventeen years ago, petitioner Carlos Carrion was charged with one count of criminal possession of a controlled substance in the first degree, twenty counts of attempted murder in the first degree, one count of criminal use of a firearm in the first degree, two counts of criminal possession of a weapon in the third degree, and one count of reckless endangerment in the first degree.[1]  These charges grew out of Carrion's purchase of a large amount of cocaine and an ensuing gun fight with the police.  Carrion purchased eleven

---

[1]    *See* Report and Recommendation of Magistrate Judge Frank Maas to the Honorable Shira A. Scheindlin ("R&R"), dated January 25, 2007, at 6.

pounds of cocaine from a location in the Bronx, which he intended to re-sell.[2]

While traveling to and from the purchase site, Carrion carried two firearms with

him.[3]  As he was traveling in a cab, the police directed the cab driver to stop and

pull over.[4]  Instead of stopping, the cab raced down the street before coming to an

abrupt stop.[5]  At this point, Carrion exited the cab on foot.[6]  A gun battle ensued

between Carrion and a number of police officers.[7]  Carrion appeared to fire at the

police officers first.[8]  Carrion hit one of the police officers in the arm and

continued shooting at them as he fled.[9]  Carrion was eventually subdued after

several police bullets struck him.[10]  Carrion has been rendered a paraplegic as a

result of the injuries he sustained that day.[11]

---

[2]   *See id.* at 3, 5.

[3]   *See id.* at 5.

[4]   *See id.* at 4.

[5]   *See id.*

[6]   *See id.*

[7]   *See id.*

[8]   *See id.*

[9]   *See id.* at 4-5.

[10]   *See id.* at 5.

[11]   *See id.* at 2.

After he was indicted, the prosecution offered Carrion a plea deal that

would have permitted him to plead guilty to a single count of criminal possession

of a controlled substance in the first degree that would carry an indeterminate

sentence of ten years to life imprisonment on the condition that he allocute to all

of the crimes charged in the indictment.[12]  Carrion declined the offer and

proceeded to trial.[13]  On October 19, 1993, the jury convicted Carrion of five

counts of attempted murder and all of the other charges.[14]  On December 10, 1993,

the court sentenced Carrion to an aggregate indeterminate prison term of 125 years

to life.[15]

After properly exhausting his state court remedies, Carrion filed the

instant petition for habeas corpus.  He raised the following claims:

> ● ineffective assistance of trial counsel, in violation of
> the Sixth Amendment, resulting from his trial
> attorney's alleged failure "to fully inform and advise
> him" about the People's pretrial offer

---

[12] *See id.* at 17.  A sentence of ten years to life imprisonment would have
entitled Carrion to his first parole hearing after ten years of incarceration.

[13] *See id.* at 6-8.

[14] *See id.* at 9.

[15] *See id.* at 11.  *See also* Brief for Defendant-Appellant in *The People of the
State of New York v. Carlos Carrion*, Ex. A of Appendix Vol. I in Support of
Answer Opposing Petition for a Writ of *Habeas Corpus*, at 5-6.

3

- ineffective assistance of appellate counsel, in violation of the Sixth Amendment, resulting from his appellate attorney's alleged failed to raise "significant and obvious" issues on appeal

- violation of his Sixth Amendment right to be present at all material stages of the trial resulting from his exclusion from an ancillary proceeding

- violation of his Sixth and Fourteenth Amendment rights by the trial court when it imposed a sentence of 125 years to life as punishment for Carrion's decision to reject the prosecutor's pretrial plea offer and insist on a trial

- violation of the Eighth Amendment as the sentence imposed on Carrion constitutes cruel and unusual punishment because he is a paraplegic confined to a wheelchair.[16]

On January 25, 2007, Magistrate Judge Frank Maas issued an R&R to this Court in which he recommended Carrion's petition be denied. Carrion filed timely objections to the R&R which focused on Judge Maas's denial of his ineffective assistance of trial counsel claim.[17]  After reviewing the R&R and

---

[16]  *See* R&R at 14-15.  Familiarity with the R&R is assumed.

[17]  *See* Petitioner's Objections to the Magistrate Judge's Report ("Objections").  Carrion also objected to Judge Maas's recommendation that the following claims be denied: his ineffective assistance of appellate counsel claim; his Sixth Amendment right to be present at all material proceedings claim; and his Eighth Amendment sentencing claim. *See id.* at 1 n.1.  Carrion did not elaborate on these claims in his Objections; rather he "relie[d] on the arguments contained in his Memorandum in Support of Traverse, submitted 12/15/04." *Id.*  I have reviewed

Carrion's Objections in detail, I respectfully disagreed with the conclusions

reached by Judge Maas and found that Carrion had not received effective

assistance from his trial counsel, Roy Kulcsar, with regard to the advisability of

accepting a ten-year plea offer.[18]  Without holding an evidentiary hearing, but

upon careful review of the state court record and the hearing before the Magistrate

Judge, I granted Carrion's section 2254 petition.[19]  The People appealed, and the

Second Circuit remanded, based on this Court's failure to hold its own evidentiary

hearing.[20]  Specifically, the Second Circuit stated that "[f]or the district court,

upon remand, to adhere to its own credibility conclusions, as opposed to those

found by the magistrate judge, the district court would need to conduct a renewed

_____

these claims and Carrion's original arguments and agree with Judge Maas's
recommendation that these claims are without merit.  Accordingly, all of Carrion's
habeas claims, other than his ineffective assistance of counsel claim with regard to
the plea offer, are hereby dismissed.

[18]   *See Carrion v. Smith*, 537 F. Supp. 2d 518, 520 (S.D.N.Y. 2008).
Familiarity with this Opinion and Order is assumed.

[19]   *See id.* at 532 ("In sum, having found both inadequate representation and
prejudice, the inevitable conclusion is that the state-court decision rejecting
Carrion's ineffective assistance of counsel claim constitutes an unreasonable
application of federal law.").

[20]   *See Carrion v. Smith*, 549 F.3d 583 (2d Cir. 2008).  Familiarity with this
Opinion is also assumed.

5

hearing to appraise the credibility of the witnesses."[21]  The Second Circuit did not

address, however, whether Kulcsar provided constitutionally ineffective assistance

in failing to vigorously advise Carrion to take the plea offer.[22]  But the Second

Circuit did not foreclose this possibility.[23]

## II.    BACKGROUND

### A.    Prior Proceedings

    In my original decision, I found that Carrion satisfied the two-part

test for ineffective assistance of counsel claims, as established in *Strickland v.*

*Washington.*[24]

> Other than Kulcsar's lukewarm endorsement that the
> proffered plea bargain was a "good offer," he did nothing
> to persuade his client to take what was obviously a very
> beneficial deal.  Moreover, Kulcsar was aware, and so
> informed Justice Snyder, that the events responsible for

---

[21]    *Id.* at 590.

[22]    *See id.* ("[W]e are unable to review the legal determination that Kulcsar's
failure to 'vigorously advise his client' to take the plea offer constituted
'constitutionally deficient' counsel.").

[23]    *See id.* ("[T]here may perhaps be circumstances where the disparity between
the sentence offered under a plea agreement and the sentencing exposure in the
absence of such an agreement (factoring in both the probable sentence and the
likelihood of conviction) might require counsel to give advice about the benefits
and risks of accepting or not accepting a plea offer beyond merely stating the
sentencing exposure . . . .").

[24]    466 U.S. 668, 687 (1984).

causing his client's paralysis was an impediment to his
client taking the plea because his client believed that these
events established a defense to all of the charges he was
facing. But Kulcsar made no efforts to explore this area
with his client in order to dispel his belief that the shooting
established a viable defense to the charges against him.
Finally, Kulcsar must have been aware that the People had
an open and shut case against his client, at least with
respect to the drug possession charge, which carried a
mandatory minimum fifteen year penalty. In sum, only a
constitutionally deficient attorney would have failed to
vigorously advise his client to take the plea. Under these
circumstances, I find that Kulcsar's representation fell
below the requirement for constitutionally effective
assistance of counsel.[25]

In addition, based on statements made by Carrion in a post-hearing affidavit[26] and

the significant disparity between the plea offer and the sentence imposed after

---

[25]  *Carrion*, 537 F. Supp. 2d at 530 (footnote omitted).

[26]  As part of his Objections to the R&R, Carrion submitted an affidavit
wherein he stated:

I would have accepted the favorable plea had I been
properly notified and advised by counsel that the minimum
I faced was 15 years to life. It surely served my best
interest to do so considering the overwhelming damning
evidence and unfavorable odds that were against me at the
time.

Affidavit Opposing Report and Recommendation to the Honorable Shira A.
Scheindlin ¶ 9.

trial, I found that Carrion established the requisite prejudice.[27]  I concluded that the

"appropriate remedy here is to give Carrion the benefit of the original plea offer

and re-sentence him accordingly."[28]

## B.     The State Court Decision

The relevant state court decision is the trial court's December 14,

2001 Order (the "Order") denying Carrion's pro se motion to vacate his judgment

of conviction pursuant to New York Criminal Procedure Law § 440.10 ("section

440.10").[29]  The Order describes Carrion's ineffective assistance claims as

follows: (1) "[t]he defendant claims that his trial attorney did not provide effective

assistance of counsel" and (2) "[t]he defendant claims that defense counsel's trial

tactical decisions constituted ineffective assistance of counsel."[30]  The first claim

encompasses the alleged failure by Kulcsar to adequately encourage Carrion to

accept the People's ten-year plea offer (the "advice claim") while the second claim

---

[27]     *See Carrion,* 537 F. Supp. 2d at 532 ("Given these assertions, coupled with
the significant sentencing disparity, I find there to be sufficient objective evidence
to support the conclusion that there is a reasonable probability that Carrion would
have accepted the plea offer, if properly counseled by Kulcsar.").

[28]     *Id.* at 533.

[29]     *See* 12/14/01 Order of the Honorable Leslie Crocker Snyder ("12/14/01
Order" or "December 14, 2001 Order"), Ex. I to Appendix Vol. II in Support of
Answer Opposing Petition For a Writ of *Habeas Corpus* ("Appendix Vol. II").

[30]     *Id.* at 1.

addresses the quality of representation Carrion received at trial (the "representation claim").

After reciting the federal and state standards for ineffective assistance of counsel, the state court addressed Carrion's representation claim and held that Carrion received effective trial representation under both standards.[31] However, with regard to the advice claim – that Carrion received constitutionally inadequate advice regarding the advisability of accepting the ten-year plea offer – the state court relied on the arguments set forth by the People in opposition to Carrion's section 440.10 motion.[32]

In the People's Response to Defendant's CPL 440.10 Motion,[33] the People argued that Carrion was not prejudiced by Kulcsar's plea offer advice, or lack thereof, because despite Carrion knowledge of the ten-year plea offer he

---

[31] *See id.* at 2 ("While the defendant may now disagree with the arguments made by defense counsel during the trial, the Court of Appeals has held that facile hindsight or mere disagreement with an exercise of professional judgment by defense counsel does not translate automatically into ineffective assistance of counsel. So long as the evidence, the law and the circumstances of a particular case reveal that the attorney provided meaningful representation, constitutional requirements will have been met.") (citations omitted).

[32] *See id.* at 3 ("As to the defendant's remaining arguments, they are denied for the reasons set forth by the People in their response.").

[33] Ex. H to Appendix Vol. II.

9

insisted on going to trial.[34]  These arguments were adopted by the trial court and

incorporated into its Order.[35]  Neither the People, nor the trial court, ever

addressed the adequacy of Kulcsar's advice regarding the advisability of the

People's ten-year plea offer or whether Kulcsar adequately informed Carrion of

his sentencing exposure if he went to trial.  These inquiries were foreclosed by the

finding that Carrion did not suffer any prejudice from the lack of counsel's advice

given his insistence on going to trial.  Accordingly, the question is whether the

Order represents an unreasonable application of federal law (here, *Strickland*) by

the state court.

### C.    The Hearing Before the Magistrate Judge

The crucial question, then, is what actually transpired between

Carrion and Kulcsar over fifteen years ago.  At the hearing before Magistrate

Judge Maas, Carrion testified that Kulcsar discussed the plea offer with him once,

at a meeting they had at Bellevue Hospital.[36]

> Carrion testified that at this meeting Kulcsar told him there
> was a plea offer: "[H]e told me that it was 10 to life, and I

---

[34]    *See id.*

[35]    *See* 12/14/01 Order at 3 ("As to the defendant's remaining arguments, they
are denied for the reasons set forth by the People in their response.").

[36]    *See Carrion*, 549 F.3d at 586.

> told him what he think about it? He said, it's my decision.
> And he thought that it was a good offer." According to
> Carrion, he was never informed what the maximum
> sentence could be if he were convicted of the charges
> against him, nor of the mandatory minimum sentences on
> the various charges. Carrion stated that Kulcsar did not
> discuss with him the likelihood that he would be convicted
> of the cocaine possession charge, or the fact that the charge
> carried a 15-year minimum sentence.[37]

Kulcsar, on the other hand, had little recollection of Carrion's case and did not

remember any meetings with Carrion.[38]  Kulcsar did not remember how many

times he discussed the plea offer with Carrion or when and where such discussions

took place.[39]  Instead of providing specific details, Kulcsar testified that it was his

standard practice to make no recommendation to clients as to whether they should

take a plea.[40]  Based on Kulcsar's established practice, "Judge Maas rejected

Carrion's assertions as incredible and found that Kulcsar had advised him of the

possibility of a very lengthy minimum sentence if he proceeded to trial."[41]

---

[37]  *Id.*

[38]  *See id.*

[39]  *See id.*

[40]  *See id.*

[41]  *Id.* at 587.

11

### D.     The Hearing Before This Court

This Court conducted its own evidentiary hearing on April 15, 2009,

April 28, 2009, and May 4, 2009.[42]  After the hearing, the parties submitted post-

hearing memoranda of law.  At the hearing, both parties were represented by

counsel.  Both Carrion and Kulcsar, among others, testified at the hearing.  The

following is a summary of the relevant portions of their testimony.

### 1.     Carrion's Testimony

After retained counsel withdrew from Carrion's criminal case, the

state court assigned Kulcsar to represent Carrion.[43]  Carrion recalled having first

met Kulcsar while at Bellevue Hospital, where Carrion was recuperating from five

gun shot wounds he received while battling with the police.[44]  It was at this

meeting, which lasted approximately thirty to forty-five minutes, that Kulcsar

conveyed to Carrion the terms of the People's  ten to life plea offer.[45]  Kulcsar did

not, however, explain what Carrion would have to do to obtain this plea, nor did

---

[42]   Citations to the transcripts of the three hearing dates before this Court are as
follows: "4/15/09 Tr.," "4/28/09 Tr.," and "5/4/09 Tr."

[43]   *See* 5/4/09 Tr. at 39.

[44]   *See id.*

[45]   *See id.* at 50.

he discuss the requirement that Carrion allocute to all the charges.[46]  According to Carrion, Kulcsar characterized the plea offer as a "good offer,"[47] but he never questioned Kulcsar as to why he thought so.[48]  Kulcsar did not offer any other advice about the plea offer or whether it would be wise for Carrion to accept it.[49] Kulcsar simply told Carrion that whether or not to take the plea was his decision.[50]

Carrion also testified that Kulcsar never informed him of his sentencing exposure if he went to trial and was unsuccessful.[51]  Carrion admitted to Kulcsar that he possessed eleven pounds of cocaine at the time he exited and fled from the cab.[52]  Kulcsar never told Carrion that the minimum sentence for that quantity of cocaine was fifteen years to life, nor did he tell Carrion that his conviction on the drug count was virtually inevitable.[53]  Although Carrion also admitted that he had two handguns at the time of his arrest, Kulcsar failed to

---

[46]  *See id.* at 44.

[47]  *Id.* at 43.

[48]  *See id.* at 61.

[49]  *See id.* at 43, 45.

[50]  *See id.* at 43.

[51]  *See id.* at 46-47.

[52]  *See id.* at 42.

[53]  *See id.*

inform him of the sentence for illegal possession of a weapon.[54]  In a similar vein,

Kulcsar did not discuss with Carrion the strength of the prosecution's case with

regard to the attempted murder charges, nor did he tell Carrion what the sentence

would be for attempted murder of a police officer.[55]  Finally, Kulcsar never

informed him that his sentences could be imposed consecutively so that if he were

convicted of five counts of attempted murder, he could be sentenced to

consecutive twenty-five years to life on each count, which would amount to a

sentence of 125 years to life.[56]

Carrion testified that had he known of the consequences of going to

trial, he would have accepted the plea offer.

> Q.     Did Mr. Kulcsar give you some idea of what might
> happen if you went to trial?
>
> A.     No.
>
> Q.     Would you have been willing to accept the plea offer
> of ten to life if you had known that the mandatory
> minimum sentence you could receive on the narcotics
> possession count against you was fifteen to life?
>
> A.     Of course.

---

[54]  *See id.* at 42, 44.

[55]  *See id.* at 43-44.

[56]  *See id.* at 44.

14

Q.    What if accepting the plea offer required you to say
that you attempted to murder ten police officers; would you
have been able to do that, if you had known what the
mandatory minimum was for narcotics possession?

A.    Yes.[57]

Carrion further testified that he was not influenced in deciding whether to plead
guilty or go to trial by the hope of a recovery in a civil lawsuit.[58]

### 2.    Kulcsar's Testimony

Kulcsar testified that there was no defense to the drug charge Carrion

was facing[59] and that, "[b]arring some miracle from God, [he] could not have

obtained an acquittal."[60] Kulcsar conceded that if Carrion were convicted on the

drug count alone, he would have been sentenced to at least fifteen years to life, but

that he had been offered a plea of ten years to life.[61] Although Kulcsar could not

recall if he actually told Carrion that there was no defense to the drug charge, he

thought "that in the context of [their] discussions it was clear that there was no

---

[57]   *Id.* at 47 (objection omitted).

[58]   *See id.* at 48.

[59]   *See id.* at 77.

[60]   4/28/09 Tr. at 66.

[61]   *See* 4/15/09 Tr. at 104.

15

defense to the drug charge."[62]

When asked whether he advised Carrion of the consequence of going to trial, Kulcsar remembered, in general terms, a discussion "as to the substantial sentence that [Carrion] could receive if he were convicted."[63]  Kulcsar could not, however, recall any specific discussions he had with Carrion concerning the sentencing ranges for the various counts with which Carrion was charged.[64] Kulcsar stated that as a matter of routine, established practice, he discussed relevant sentencing ranges with his clients and he believed he had done so with Carrion.[65]  However, excluding reliance on Kulcsar's established practice, Kulcsar could not remember whether he specifically advised Carrion of the maximum penalty should he go to trial and lose.[66]

Kulcsar testified that the "main stumbling block" to Carrion taking the plea was the prosccution's requirement that he allocute to the entire

---

[62]  *Id.* at 106.

[63]  *See* 4/28/09 Tr. at 84.

[64]  *See id.* at 60, 85.

[65]  *See id.* at 85.

[66]  *See id.* at 60.

16

indictment.[67] At Carrion's sentencing, Kulcsar stated that the primary reason for

going to trial was Carrion's belief that he was nearly assassinated and made a

paraplegic by the police as a result of being shot while he was lying on the

ground.[68] Kulcsar further stated that if it were not for Carrion's concern over a

pending or contemplated civil action against the police officers involved, he would

have pled guilty.[69] Although Kulcsar was aware that Carrion was thinking about a

civil lawsuit, he had no discussions with Carrion "regarding the consequence of

any decision he made in his criminal case with respect to a civil lawsuit because

that's not [his] area of expertise."[70] With regard to the potential civil case, Kulcsar

testified as follows:

> I had no discussions with Mr. Carrion relating to his civil
> case, how the criminal case would affect the civil case or
> not.  The only discussions I had with him related

---

[67]  4/15/09 Tr. at 98.

[68]  *See id.* at 103 ("I sincerely believe that if he had not had an honest belief
that he was shot while he was on the ground and suffered paralysis as a result of
being shot in the back by the police while he was already on the ground, he would
not have gone to trial.").

[69]  *See id.* at 73 ("I believe that a primary interest of Mr. Carrion other than
being found not guilty of attempted murder of police officers was to establish the
fact that when he was shot and sustained the injury that made him a paraplegic, he
was lying on the ground because he either had a pending action against the police
officers or contemplated bringing a civil action.").

[70]  *Id.* at 99.

17

specifically to the criminal case, whether or not he wanted to take the plea, that he understood what the parameters of the plea were and what was required of him to take the plea, and that it was his decision as to whether or not he wanted to plead.[71]

Kulcsar does not, however, advise his clients as to the advisability of

taking a plea, even when it is in their best interests to do so. Kulcsar's established

"no advice" policy became apparent through the following colloquy:

> THE COURT:      You don't give advice?
>
> THE WITNESS:   I don't tell them what I believe they should do when they ask me, what do you think I should do. What I've always said . . . is the ultimate decision is only yours. I can only assist you in whichever way you decide, but the decision has to be yours because whatever that decision is – you have to live with it.
>
> THE COURT:      You don't say my advice is?
>
> THE WITNESS:   No.
>
> THE COURT:      If that person asks for advice, do you give it?
>
> THE WITNESS:   No. Because my experience after 30 years, the question is always phrased, what do you think I should do? And I've always said, I can't tell you what you should do. I know what I would do, but that's not necessarily the same thing you should do or you would want to do.

---

[71]   *Id.*

18

> THE COURT:      Anyway, you don't give advice and if
> asked you don't give the advice either?
>
> THE WITNESS:   I don't give specific advice, yes, you
> should take the plea or, no, you should not take the plea.
> . . .[72]

Kulcsar followed his "no advice" policy and did not advise Carrion to take the plea offer even though he realized Carrion's judgment was "clouded" by his physical injuries and paralysis.[73] Kulcsar never told Carrion that going to trial was a bad decision, much less the worst decision he ever made in his life.[74] In Kulcsar's own words: "I did not bang him over the head and tell him, if you don't take this plea and go to trial in front of [the judge] . . . you're going to get a substantial, substantial, substantial, substantial sentence."[75] Nor did Kulcsar recall any conversation in which Carrion asked Kulcsar what he should do.[76]

---

[72] *Id.* at 105-106. Kulcsar reaffirmed his no advice policy on the second day of the hearing. *See* 4/28/09 Tr. at 64 (Kulcsar stating: "Again, if a client says what do I think they should do, I will not say, you should do this or you should do that.").

[73] *See* 4/28/09 Tr. at 75.

[74] *See id.* at 69, 72.

[75] *Id.* at 69.

[76] *See* 5/14/09 Tr. at 10.

Kulcsar acknowledged that perhaps he should have spent more time with Carrion discussing his decision.[77] In hindsight, Kulcsar now believes that he should have had a court-appointed psychiatrist examine Carrion to see if he was suffering from post-traumatic stress disorder which "was causing him to make a decision that in [Kulcsar's] opinion was not a good decision."[78] In sum, Kulcsar concedes that he did not have any "forceful, vigorous" discussions to try to influence Carrion to take the plea.[79]

## III. STANDARDS[80]

### A. Section 2254 Standard

In applying the "unreasonable application" prong of section 2254(d)(1), the Second Circuit offered the following guidance regarding the deferential standard mandated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996):

---

[77] *See* 4/28/09 Tr. at 75.

[78] *Id.* at 72.

[79] *Id.* at 63.

[80] The standards for section 2254 petitions, ineffective assistance of counsel in general, and ineffective assistance of counsel with regard to plea offers were recited in this Court's earlier Opinion. *See Carrion*, 537 F. Supp. 2d at 520-25. Below is a discussion of cases that came to this Court's attention after that Opinion was issued.

20

Prior to AEDPA, it sufficed for a grant of habeas for a
federal court to conclude that the petitioner was denied
adequate representation and suffered prejudice, within the
meaning of *Strickland*.  AEDPA, however, requires more
than a conclusion that counsel's performance was
constitutionally inadequate.  Under the AEDPA standard,
"objectively unreasonable application involves some
increment of incorrectness beyond error."     *Hemstreet v.
Greiner*, 491 F.3d 84, 90 (2d Cir. 2007).  Habeas may not
be granted unless the federal court concludes not only that
counsel's performance was deficient, but also that the state
court's conclusion to the contrary was unreasonable.
Satisfaction of the "unreasonable application" requirement
does not follow inevitably from the district court's
conclusion that Kulcsar's performance was deficient.  The
court was not at liberty under AEDPA to grant habeas
relief unless it made the further finding that the state
court's application of *Strickland* was unreasonable.[81]

More recently, the Supreme Court addressed the issue of ineffective

assistance of counsel within the context of a section 2254 petition.[82]  In *Knowles v.*

*Mirzayance*, defense counsel recommended that his client, Alexandre Mirzayance,

withdraw his not guilty by reason of insanity ("NGI") plea after the jury convicted

him of first-degree murder during the guilt phase of a bifurcated trial.[83]  "When the

---

[81]   *Carrion,* 549 F.3d at 591 n.4.

[82]   *See Knowles v. Mirzayance*, 129 S. Ct. 1411 (2009).

[83]   *See id.* at 1414-15.  Under California law, when a defendant enters both a
plea of not guilty and a plea of not guilty by reason of insanity, the court must hold
a bifurcated trial where guilt is determined during the first phase and the viability
of the defendant's NGI plea is determined during the second phase.  *See id.* at

21

jury found Mirzayance guilty of first-degree murder, counsel doubted the

likelihood of prevailing on the NGI claim."[84]  Accordingly, "on the advice of

counsel, Mirzayance abandoned his NGI plea before [the second phase of the

bifurcated trial] commenced."[85]

   In state post-conviction proceedings, Mirzayance claimed that his

attorney's recommendation to withdraw the NGI plea constituted ineffective

assistance of counsel under *Strickland*.[86]  The trial court's denial of Mirzayance's

state habeas petition was affirmed by the California Court of Appeal.[87]

Mirzayance then filed a petition for federal habeas relief under section 2254,

which was initially denied by the district court.[88]  The Ninth Circuit reversed the

district court and "ordered an evidentiary hearing on counsel's recommendation to

---

1415.

  [84] *Id.* at 1416.

  [85] *Id.* at 1415 ("Because the [same] jury rejected similar evidence at the guilt
phase (where the State bore the burden of proof), counsel believed a defense
verdict at the NGI phase (where the burden was on the defendant) was unlikely.").

  [86] *See id.*

  [87] *See id.*  Thus, the relevant state court decision was the California Court of
Appeal's decision denying Mirzayance state habeas relief.  *See id.* at 1419.

  [88] *See id.* at 1415.

withdraw the NGI plea."[89]  During that hearing, the Magistrate Judge found that

Mirzayance "had nothing to lose" by going forward with the NGI phase of the trial

and held that counsel's performance was therefore deficient.[90]  The district court

accepted the Magistrate Judge's recommendation to grant the writ.[91]  The Court of

Appeals affirmed the district court based, in part, on its view that counsel had

nothing to lose by pursuing the NGI defense.[92]  The Supreme Court reversed.

> The Supreme Court held that the state court decision denying

Mirzayance's ineffective assistance claim did not violate clearly established

federal law.[93]

> > With no Supreme Court precedent establishing a "nothing
> > to lose" standard for ineffective-assistance-of-counsel
> > claims, habeas relief cannot be granted pursuant to §
> > 2254(d)(1) based on such a standard.  Instead, such relief
> > may be granted only if the state-court decision
> > unreasonably applied the more general standard for

---

[89]  *Id.*

[90]  *See id.* at 1417.

[91]  *See id.*

[92]  *See id.* at 1417-18.  The Ninth Circuit found that the California Court of
Appeals unreasonably applied clearly established federal law "because defense
counsel's failure to pursue the insanity defense constituted deficient performance
as it secured no actual tactical advantage." *Id.* at 1418 (quotation marks, ellipses
and alteration omitted).

[93]  *See id.* at 1419.

> ineffective-assistance-of-counsel claims established by
> *Strickland* . . . . Indeed, this Court has repeatedly applied
> that standard to evaluate ineffective-assistance-of-counsel
> claims where there is no other Supreme Court precedent
> directly on point.[94]

"[B]ecause the *Strickland* standard is a general standard, a state court has even

more latitude to reasonably determine that a defendant has not satisfied that

standard."[95] The Supreme Court thus held that "[u]nder the doubly deferential

judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1)

standard, Mirzayance's ineffective-assistance claim fails."[96] "Where, as here, a

district court has performed additional fact finding," the issue is "whether the state

court's decision was contrary to, or involved an unreasonable application of,

clearly established Federal law in light of any newly-discovered facts."[97]

## B.   *Strickland*

To succeed on a claim of ineffective assistance of counsel in violation

---

[94]   *Id.*

[95]   *Id.* at 1420 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations[.]")).

[96]   *Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (per curiam)).

[97]   *Wilson v. Mazzuca*, 570 F.3d 490, 501 (2d Cir. 2009) (quotation marks and citation omitted).

of the Sixth Amendment, a petitioner "must demonstrate (1) that his attorney's performance 'fell below an objective standard of reasonableness,' and (2) that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"[98] Under the first prong – the performance prong – the inquiry is "contextual" and "asks whether defense counsel's actions were objectively reasonable considering all the circumstances."[99] In determining what constitutes objective reasonableness, courts look for guidance to "'[p]revailing norms of practice as reflected in American Bar Association standards.'"[100] Courts also consider the "basic duties" of a defense attorney, as described in Supreme Court cases before and after *Strickland*.[101] Attorney errors that fall below an objective standard of reasonableness "include omissions that cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness."[102] "'Judicial

---

[98] *Id.* (quoting *Strickland*, 466 U.S. at 688, 694.

[99] *Purdy v. United States*, 208 F.3d 41, 44 (2d Cir. 2000) (citing *Strickland*, 466 U.S. at 688).

[100] *Id.* (quoting *Strickland*, 466 U.S. at 688). *Accord Knowles*, 129 S.Ct. at 1420 ( "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (quotation marks omitted)).

[101] *Strickland*, 466 U.S. at 688.

[102] *Wilson*, 570 F.3d at 502 (quotation marks omitted).

scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"[103]

"Under the second prong – the prejudice prong – a 'reasonable probability' of a different result is a 'probability sufficient to undermine confidence in the outcome.'"[104]  "The prejudice prong can be satisfied 'even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.'"[105]

## C.    Ineffective Assistance of Counsel - Plea Offers

Among the "basic duties" of a defense attorney are the "duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."[106]  The professional norms of conduct "provide at least two benchmarks for the representation of a client who is deciding whether to accept a plea offer."[107]

---

[103] *Knowles*, 129 S.Ct. at 1420 (quoting *Strickland*, 466 U.S. at 689).

[104] *Id.* (quoting *Strickland*, 466 U.S. at 694).

[105] *Id.* (quoting *Strickland*, 466 U.S. at 694).

[106] *Strickland*, 466 U.S. at 688.

[107] *Purdy*, 208 F.3d at 44.  *Purdy* is a post-AEDPA decision.

The Model Rules of Professional Conduct provide that a "lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."[108]  When a plea offer is made, "'knowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty.'"[109]  Accordingly, the lawyer "should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed."[110]

A closely related duty is that "defense counsel 'must give the client the benefit of counsel's professional advice on this crucial decision' of whether to plead guilty."[111]  In a pre-*Strickland* case, the Supreme Court described the duty to provide informed advice on a plea offer as one of the basic functions of defense counsel: "Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved

---

[108]  *Id.* at 45 (quoting Model Rules of Professional Conduct Rule 1.4(b) (1995)).

[109]  *Id.* (quoting *United States v. Gordon*, 156 F.3d 376, 380 (2d Cir. 1998) (alteration omitted)).

[110]  *Id.*

[111]  *Id.* (quoting *Boria v. Keane*, 99 F.3d 492, 497 (1996)).

and then to offer his informed opinion as to what plea should be entered."[112]   In
fact, the Supreme Court has held that a defendant "requires the guiding hand of
counsel at every step in the proceedings against him."[113]   Furthermore, "the right
to counsel is the right to *effective* assistance of counsel."[114]

In *Boria v. Keane,* the Second Circuit held that Boria's attorney had
failed to adequately advise his client with respect to a plea offer.[115]   Boria's
attorney not only failed to give his ultimate opinion as to the wisdom of the plea
offer but "never gave his client *any* advice or suggestion as to how to deal with the
People's offered plea bargain."[116]   In granting Carrion's petition, this Court stated
that the "instant case is *quite similar* to that considered in *Boria v. Keane*."[117]   The
Second Circuit disagreed with this statement, pointing out that this case "is not
within [the] scope of the ruling in *Boria*."[118]   The court explained

---

[112] *Von Moltke v. Gillies*, 332 U.S. 708, 721 (1948).

[113] *Powell v. Alabama*, 287 U.S. 45, 69 (1963).

[114] *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

[115] *See* 99 F.3d at 497.

[116] *Id.* at 498 (emphasis added).

[117] *Carrion*, 537 F. Supp. 2d at 530 (emphasis added).

[118] *Carrion*, 549 F.3d at 591 n.4.

> In *Boria*, where the defendant rejected the plea offer, counsel, who was found ineffective, "never gave his client any advice or suggestion as to how to deal with the People's offered plea bargain." In the present case, in contrast, regardless of whether Kulcsar told his client the sentencing exposure, the district court credited that he told his client that the offer was a "good offer." . . . To find Kulcsar's advice ineffective would represent a further extension of *Boria*.[119]

The Second Circuit further noted that *Boria* is a pre-AEDPA case and, therefore, employed a more liberal rule than the deferential AEDPA standard.[120]

## IV. DISCUSSION

The question is whether this Court, after conducting its own evidentiary hearing, finds the state court's denial of Carrion's ineffective assistance of trial counsel claim to be an unreasonable application of federal law under the deferential AEDPA standard. This question implicates three distinct inquiries: (1) whether Kulcsar's assistance to Carrion with regard to the plea offer fell below an objective standard of reasonableness under prevailing professional

---

[119] *Id.* (citation omitted).

[120] *See id.* ("We do not imply that a pre-AEDPA case could not serve as a precedent in determining whether a petitioner received effective assistance of counsel. The point is simply that a pre-AEDPA ruling to the effect that a representation was inadequate does not by itself furnish the answer to the further question raised by AEDPA – whether the state court's ruling to the contrary was unreasonable.").

norms;[121] (2) whether there is a reasonable probability that Carrion would have taken the plea offer but for Kulcsar's ineffective assistance; and (3) whether the state court decision finding Kulcsar's assistance to be constitutionally effective represents an unreasonable application of federal law as determined by the Supreme Court.

## A.     Carrion Did Not Receive Effective Assistance of Counsel

Kulcsar's assistance fell below an objective standard of reasonableness in two ways: (1) he failed to advise Carrion of the sentencing exposure he faced if he were convicted at trial; and (2) he failed to give Carrion advice regarding the advisability of accepting the plea offer that was sufficiently robust under the circumstances.

---

[121] Excluded from this inquiry is whether Kulcsar failed to dissuade Carrion of his mistaken belief that his injury at the hands of the police constituted a legal defense to the attempted murder charges. The Second Circuit held that this Court "erred in concluding that at the time of Carrion's rejection of the plea offer Mr. Kulcsar learned, but failed to correct, Carrion's mistaken belief that his injury inflicted by the police constituted a legal defense. There was simply no basis in the record to support this conclusion." *Carrion*, 549 F.3d at 590. *See also id.* at 589 n.2 ("The mere fact that Kulcsar stated that Carrion would have pleaded guilty if not for his belief that evidence existed that would corroborate his account of his injury does not establish that Kulcsar allowed Carrion mistakenly to believe that he had a legal defense to charges against him."). Because there was no additional evidence presented at the second hearing in support of this claim, there is no basis for this Court to conclude that Kulcsar permitted Carrion to proceed to trial under the mistaken belief that his injuries constituted a legal defense to the charges he was facing.

30

## 1.    Sentencing Exposure

When a plea offer is made and there is a reasonable probability that

the defendant is uncertain about the sentencing exposure he faces, whether or not

he accepts the plea, a lawyer unquestionably has a duty to inform his client of the

sentencing exposure he faces if he accepts the plea offer and if he does not. I

conclude, based on the testimony and the records, that Kulcsar did not inform

Carrion of the sentencing exposure he faced if he declined to accept the plea. In

this regard, Kulcsar's assistance fell below an objective level of reasonableness.

Carrion testified that Kulcsar never advised him as to the sentencing

ranges for the charges he faced.[122]   Although this testimony is self-serving, I find it

credible, especially given his demeanor in testifying and Carrion's other

corroborating testimony that he lacked the sophistication to invent.[123]   Kulcsar, on

the other hand, testified that he had no present recollection if he ever discussed

with Carrion the mandatory minimum and maximum sentences for every count in

the indictment.[124]   After the passage of so much time, the only evidence available

---

[122] *See* 5/4/09 Tr. at 44-45.

[123] Carrion admits that he asked other prisoners what they thought his likely
sentence would be. *See id.* at 48-49. The fact that Carrion would ask this of other
prisoners, strongly suggests that his own attorney never advised him in this regard.

[124] *See* 4/28/09 Tr. at 85.

31

to rebut Carrion's testimony is Kulcsar's testimony concerning his "established

practice."   The Second Circuit explained that "while neither Judge Maas nor

Judge Scheindlin was *required* to conclude from Kulcsar's testimony of his usual

practice that Kulcsar advised Carrion of his sentencing exposure, it was

permissible for either of them to do so."[125]   Although established practice

testimony is probative, it is less probative than a witness's testimony of his own

memory of the events.   Kulcsar's testimony about his past established practice was

confused[126] and not persuasive.[127]   I conclude that Kulcsar did not advise Carrion

---

[125] *Carrion*, 549 F.3d at 590 (emphasis in original).

[126] Kulcsar testified as follows: "My present recollection doesn't go back past –
all the *federal* cases that I've had over the last 19 years." *Id.* at 85 (emphasis
added). Kulcsar's reference to federal cases, which have comprised 98% of his
caseload since 1993, casts suspicion on whether the "established practice" he
described pertained to his federal, rather than state, practice. *See id.* at 60-61
(when asked about his practice with respect to advising clients, Kulcsar stated:
"Well, as you know, and also the Court knows, sentencing is a pivotal aspect of
*federal criminal practice. . . .* But my practice is to advise clients of the statutory
penalties and how the guidelines affect the sentencing, how criminal history is
calculated and how 18 U.S.C. [§] 3553(a), how that affords *federal judges* more
latitude in fashioning a sentence where there is not a mandatory minimum.")
(emphasis added)).

[127] When Kulcsar was asked to focus on his practice in state courts, he
responded with the following irrelevant hypothetical: "I would say that my
practice was – my best recollection is that all the state cases where I represented
defendants, *with the exception of maybe of one or two*, involved facts where there
was likely [a] mandatory minimum. For example, if it was murder, then it was 15
to life, I'm giving a hypothetical that based on plea bargaining might be reduced to

of the sentencing range he faced if he rejected the plea offer.

Furthermore, Kulcsar testified that if he had to do it over again, he would have asked the state court to appoint a psychiatrist to determine whether Carrion was suffering from post-traumatic stress disorder, or some other psychiatric disorder, that was impairing his judgment.[128]   This testimony is relevant as it demonstrates that Kulcsar was uncertain as to whether Carrion was capable of understanding whatever information Kulcsar did impart as to the plea offer.  Accordingly, on the basis of the testimony at the evidentiary hearing conducted by this Court, I find that Kulcsar failed to apprise Carrion of the mandatory minimum sentence he faced if he went to trial and his total sentencing exposure.[129]

## 2.   Advocacy

"Defense counsel have a constitutional duty to give their clients

---

manslaughter in the second degree, which in those days could be argued down to 5 to 15.  So I would discuss sentencing and plea options with respect to those kinds of cases."  *Id.* at 62 (emphasis added).

[128]   *See id.* at 72.

[129]   Assuming, *arguendo*, that Kulcsar informed Carrion of his minimum and total sentencing exposure, I significantly doubt that Carrion had the requisite mental and/or physical capacity to appreciate the sentencing information at the time it was allegedly given.

33

professional advice on the crucial decision of whether to accept a plea offer from the government."[130] I find that Kulcsar breached this duty given his paltry advice to Carrion concerning the plea offer.[131] Kulcsar had *one* conversation with Carrion in which he described the proposed plea as a "good offer." Under the particular circumstances of this case, this single, lukewarm endorsement of the plea offer was simply not enough. In fact, it was not clearly an endorsement of the plea offer at all: an offer might be good, for example, because it is better than what one had hoped for but still not worthy of acceptance. Indeed, Kulcsar admitted that he had a strict "no advice" policy, according to which he does not advise his clients as to the advisability of taking a plea, even when when it is in their best interests to do so. At the time the plea offer was made, Carrion was suffering from a deteriorated physical and mental state arising from his recently-inflicted paraplegia. Carrion also had a limited understanding of English and of the criminal justice system in general, as he was a first-time offender. Moreover, Kulcsar acknowledged that Carrion's judgment was "clouded," in part because he was preoccupied with a potential civil suit. But Kulcsar's concession that he knew that an acquittal on the

---

[130] *Pham v. United States,* 317 F.3d 178, 182 (2d Cir. 2003).

[131] While representation may be an art, *see Purdy*, 208 F.3d at 45, a blank canvass does not constitute a picture, much less art.

34

drug charge was virtually impossible is most striking .[132]  Given that the drug

charge carried a minimum sentence of fifteen years to life, the People's plea offer

of ten years to life was extremely generous.[133]  There was no reason why Carrion

should not have taken the plea offer and certainly no reason why Carrion should

not have been strongly advised of the advantages of doing so.  Therefore, Kulcsar

should have made an effort to persuade Carrion to do so.[134]  As Carrion argued:

> Had Kulcsar fulfilled his duty to give effective plea advice,
> he would have laid out in appropriately stark terms the
> choices facing Carrion: either accept the plea offer of 10
> years-life and allocute to the attempted murder charges, or
> go to trial without any defense to the drug, weapon
> possession and reckless endangerment charges and face a
> likely minimum 40-year-life sentence, and very possibly
> the life-without-possibility-of-parole sentence he actually
> received.  He would have also explained to Carrion in no
> uncertain terms that . . . even if he allocuted to the
> attempted murder charges, it would not prevent him from

[132] *See* 4/28/09 Tr. at 66 ("Barring some actual miracle from God, yes, I could
not have obtained an acquittal.").

[133] *See id.* at 67-68 (Kulcsar stating that "[w]ithout a doubt," Judge Snyder
would have given Carrion twenty-five years to life on the drug charge alone).

[134] *Cf. United States v. Pitcher*, 559 F.3d 120, 125 (2d Cir. 2009) (stating, in
*dicta*: "[W]e are wary of endorsing any precedent that . . . might suggest a duty on
the part of defense counsel to arm-twist a client who *maintains his innocence* into
pleading guilty.) (emphasis added) (citing *Purdy*, 208 F.3d at 45 ("[T]he ultimate
decision whether to plead guilty must be made by the defendant. And a lawyer
must take care not to coerce a client into either accepting or rejecting a plea
offer.")).

35

> going forward with his civil claim, as to which proof that
> the police had attempted to assassinate him would be
> relevant.[135]

Under the particular circumstances presented here, more was required of Kulcsar than what he gave.[136] Kulcsar's "no advice" policy under the circumstances is tantamount to the absence of counsel. Carrion should have been advised to accept the plea offer given counsel's understanding that Carrion would be convicted, at a minimum, of a count requiring a mandatory fifteen year sentence and that Carrion did not deny his guilty with respect to this count. Under these unique circumstances, where nothing could be gained by proceeding to trial, counsel should have made an explicit recommendation to take the plea offer, at the very least. If Carrion declined to accept that advice, he would then have no one to blame but himself. Consequently, regardless of the sentencing exposure issue, I find that Carrion received ineffective assistance of counsel from Kulcsar with

---

[135] Post-Hearing Reply Memorandum in Support of Petition at 11.

[136] Magistrate Judge Maas recognized as much in his recommendation to this Court. *See* R&R at 30 ("The gross disparity between the People's relatively lenient plea offer and the sentence that Justice Snyder was likely to impose in the event of a conviction indicates that greater direction from Mr. Kulcsar concerning the advisability of a plea would have been desirable.").

regard to the plea offer.[137]

   This finding is not in conflict with the recent decision of the

Honorable Denise Cote in *Berry v. Ercole*,[138] a case that is both similar and

dissimilar to the case *sub judice*. In *Berry*, the defendant was indicted for, *inter*

*alia*, Attempted Murder in the Second Degree, the most serious charge.[139] Berry

was represented by Allan Brenner who, like Kulcsar, could not recall specific

conversations with his client but testified as to his established practice.[140] Before

the trial began, Berry, like Carrion, was offered a generous plea bargain. His

attorney conveyed the offer with little advice as to whether Berry should take it.[141]

Berry was convicted of all counts contained in the indictment and was sentenced

to an aggregate prison term of thirty-five years.[142] At the time of his sentencing,

---

[137] In finding that the first prong of the two-part *Strickland* test has been met, this Court believes that a further extension of *Boria* is warranted. This Court does not support a *per se* rule but believes that an extension of *Boria* should be limited to the particular circumstances of this case.

[138] No. 06 Civ. 6957, 2009 WL 1321906 (S.D.N.Y. May 12, 2009).

[139] *See id.* at *2.

[140] *See id.*

[141] *See id.* at *3.

[142] *See Berry v. Ercole*, No. 06 Civ. 6957, 2008 WL 6083919, at *1 (S.D.N.Y. Dec. 19, 2008) (Report and Recommendation).

the state court judge engaged Berry in a colloquy in which Berry affirmed that he

had wanted to go to trial and understood that he could get a much longer sentence

as a result.[143]

                  Five years later, Berry filed a federal petition for a writ of habeas

corpus claiming that his trial counsel failed to provide him "with advice as to

whether to accept the prosecution's favorable 9 year plea offer."[144]  Judge Cote

held an evidentiary hearing during which "Berry admitted that he had repeatedly

told Brenner that he was innocent."[145]  Furthermore, with regard to Brenner's

advice, Judge Cote found that "Brenner did not explicitly advise Berry on

February 2, 2001 to plead guilty and accept the offer of a nine year sentence.

Brenner did, however, advise Berry that it was a generous offer."[146]  Finally, citing

Berry's colloquy with the state court judge, Judge Cote found that Berry failed to

---

[143] *See Berry*, 2009 WL 1321906, at *3.  Judge Cote noted that "[t]he judge's direct interaction with Berry about this decision is entitled to great weight in any assessment of whether Berry made a voluntary and informed decision to reject the plea offer." *Id.* at *12.

[144] *Id.* at *5.

[145] *Id.* at *6.

[146] *Id.* at *7 ("While Brenner could not remember in 2008 or 2009 the conversation in which he had informed Berry in 2000 of his sentencing exposure, there is no reason that Brenner would not have followed his customary practice in 2000 in this regard and advised Berry of the sentencing range for each top count.").

38

show that he would have pled guilty had Brenner encouraged him to accept the plea offer.[147]

      *Berry* is distinguishable from the instant case on two separate grounds. *First*, unlike Berry, who consistently maintained his innocence as to all charges, Carrion never disavowed possessing eleven pounds of cocaine, nor could he. Thus, this "innocence factor," which Judge Cote relied upon so heavily in finding that there was no prejudice to Berry,[148] does not apply to Carrion. *Second*, in *Berry*, Judge Cote found that the trial court's direct interaction with Berry during the plea colloquy was entitled to "great weight in any assessment of whether Berry made a voluntary and informed decision to reject the plea offer."[149] Here, there was no such colloquy. Although the trial judge was informed that Carrion's preoccupation with a contemplated civil suit was a major impediment to his accepting the plea offer, there is no indication that she ever explored this concern with Carrion directly or otherwise questioned him as to whether he

---

[147] *See id.* at *9.

[148] *See id.* at *8 ("Moreover, although Berry now asserts that he would have pleaded guilty if Brenner had recommended that course of action to him, he does not deny that he always told Brenner that he was innocent of the charges against him, and he still contends that he is innocent.").

[149] *Id.* at *12.

39

knowingly rejected the plea offer. Thus, there is no colloquy on which this Court could rely to determine whether Carrion made a "voluntary and informed decision" in rejecting the plea offer.[150] For these reasons, *Berry* is distinguishable.

In sum, having found that Carrion has met the first prong of *Strickland* in that he has shown that Kulcsar's performance fell below an objective standard of reasonableness, the next query is whether Carrion has established the requisite prejudice. Only if this question can be answered in the affirmative can this Court proceed to analyze whether the state court's decision denying Carrion's ineffective assistance claim constituted an unreasonable application of federal law.

## B.    Prejudice

The second *Strickland* prong requires a showing of prejudice which, in the Second Circuit, requires "some objective evidence other than defendant's assertions."[151] "Generally, a defendant suffers prejudice if there is a reasonable

---

[150] *Id.* ("The existence of this colloquy between the trial judge and Berry at the moment that Berry rejects the plea offer is particularly significant. It is entirely fair to assume that the experienced and able state court judge would have conducted an even more searching inquiry if he had any doubt, based on Berry's age, mental ability or sophistication, the quality of defense counsel, or any other relevant factor, that Berry understood the significance of his decision to reject the plea offer.").

[151] *Pham*, 317 F.3d at 182. *Accord United States v. Gordon*, 156 F.3d 376, 381 (2d Cir. 1998) ("This 'objective evidence' rule is consistent with our holding in *Boria*.").

40

probability that his reliance on counsel's ineffective assistance affected the outcome of the proceedings."[152]  "[A] significant sentencing disparity in combination with defendant's statement of his intention [to have pled guilty] is sufficient to support a prejudice finding."[153]  Here, the disparity between the plea offer – ten years to life –  and the sentence imposed – 125 years to life – is *extremely* large.  In addition, at the hearing before this Court, Carrion testified that he would have pled guilty if he knew the drug possession charge carried a minimum sentence of fifteen years to life.  Given this assertion, which I find to be credible, coupled with the significant sentencing disparity, I find there to be sufficient objective evidence to support the conclusion that there is a reasonable probability that Carrion would have accepted the plea offer, if properly counseled by Kulcsar.  Carrion has therefore satisfied the prejudice prong of *Strickland*.

The People argued to the state court that Carrion suffered no prejudice because he thought that agreeing to the plea bargain would negatively

---

[152] *Id. Accord Mask v. McGinnis*, 233 F.3d 132, 140 (2d Cir. 2000) ("[A] petitioner need only show that but for counsel's errors there was a 'reasonable probability' that the result of the plea bargaining process would have been different.").

[153] *Pham*, 317 F.3d at 182. *Accord Gordon*, 156 F.3d at 381 ("We agree with the district court that such a [large] disparity provides sufficient objective evidence – when combined with a petitioner's statement concerning his intentions – to support a finding of prejudice under *Strickland*.").

affect his civil suit. Carrion denies this. The only support for this assertion is

Kulcsar's belief, which he repeated during testimony before this Court, that

Carrion did not accept the plea out of concern for the civil trial. Later in his

testimony, however, Kulcsar admitted that he "had *no* discussions with Mr.

Carrion relating to his civil case, how the criminal case would affect the civil case

or not."[154]  Thus, Kulcsar's belief that Carrion was motivated not to take the plea

offer because of its impact on his potential civil case was based on pure

speculation. Furthermore, if Kulcsar believed that Carrion's decision not to accept

the plea offer rested on this ground, Kulcsar was plainly ineffective for failing to

discuss this issue with Carrion – especially given what was at stake and the

implausibility of his civil claim. In short, in light of the newly discovered facts,

the only reasonable conclusion is that Carrion was prejudiced by Kulcsar's

failures.[155]

## C.    The State Court Decision Represents an Unreasonable Application of Federal Law

Carrion was denied the effective assistance of counsel by Kulcsar's

---

[154]  4/15/09 Tr. at 99 (emphasis added).

[155]  In referring to newly discovered facts, I refer primarily to Kulcsar's admission that he never discussed Carrion's civil claims with him and Carrion's claim that Kulcsar failed to advise him of the applicable sentencing ranges for each of the counts.

42

failure to advise Carrion of the relevant sentencing ranges and his failure to

meaningfully advise Carrion to accept the terms of the plea offer. It would be an

unreasonable application of clearly established Federal law, as determined by the

Supreme Court, to hold otherwise.[156]

As stated earlier, the relevant state court decision is the December 14,

2001 Order denying Carrion's section 440.10 motion. In his motion, Carrion

stated:

> As defendant has sworn to in his affidavit, had he known
> his odds, he would have accepted the people's offer, for
> counsel not to truly stress the position of the case, allowing
> the defendant to press on to trial, viewing the nature of the
> charges, five counts of attempted murder upon the police,
> counsel failed to advise the defendant not to pursue the
> suicidal course he seemed bent upon following.[157]

The trial court did not squarely address Carrion's ineffectiveness of pretrial

counsel claim but instead held that "[a]s to the defendant's remaining arguments,

they are denied for the reasons set forth by the People in their response."[158] The

December 14, 2001 Order is undeniably a decision on the merits. The question is

---

[156] 28 U.S.C. § 2254(d)(1).

[157] Carrion's Pro Se Memorandum of Law in Support of his Motion Under
C.P.L. section 440.10, Ex. G. to Appendix Vol. II, at 12.

[158] 12/14/01 Order at 3.

43

whether that denial is a summary rejection of Carrion's ineffective assistance

claim without explanation or whether this Court must analyze the People's

response to Carrion's section 440.10 motion, as incorporated in the December 14,

2001 Order, in determining whether the state court Order represents an

unreasonable application of Federal law.

Where "'a state court fails to articulate the rationale underlying its

rejection of a petitioner's claim, and when that rejection is on the merits, the

federal court will focus its review on whether the state court's ultimate decision

was an unreasonable application of clearly established Supreme Court

precedent.'"[159] For the reasons just discussed, I conclude that the state court's

decision denying Carrion's ineffective assistance claim is an unreasonable

application of the *Strickland* standard.

The conclusion remains the same even when this Court analyzes the

People's response to Carrion's section 440.10 motion. The People's opposition is

---

[159] *Wilson,* 570 F.3d at 499 (quoting *Eze v. Senkowski*, 321 F.3d 110, 125 (2d
Cir. 2003) (further quotation marks omitted)). *Accord Davis v. Greiner*, 428 F.3d
81, 88 (2d Cir. 2005); *Aeid v. Bennett*, 296 F.3d 58, 62 (2d Cir. 2002); *Sellan v.
Kuhlman*, 261 F.3d 303, 311-12 (2d Cir. 2001) ("[W]hen a state court fails to
articulate the rationale underlying its rejection of a petitioner's claim, and when
that rejection is on the merits, the federal court will focus its review on whether
the state court's ultimate decision was an 'unreasonable application' of clearly
established Supreme Court precedent.").

based, in essence, on the argument that Carrion could not have been prejudiced by Kulcsar's assistance, or lack thereof, because he was suicidally bent on going to trial – no matter what. But the newly discovered evidence shows that there is no reason to believe that Carrion was bent on going to trial.[160] Furthermore, there is prejudice as it is beyond dispute that had Carrion been properly counseled, he might well have accepted the plea offer and received a much shorter sentence.[161] Any conclusion to the contrary constitutes an unreasonable application of Federal law, notwithstanding the "doubly deferential" standard described in *Knowles*.[162] In sum, upon further analysis and after holding my own evidentiary hearing, I stands by my initial determination "that the state-court decision rejecting Carrion's ineffective assistance of counsel claim constitutes an unreasonable application of federal law."[163]

---

[160] *See supra* note 155.

[161] *See Boria*, 99 F.3d at 496. *See also id.* at 497 ("[T]here would have been more than a 'reasonable probability' that the father would have organized the family to persuade the petitioner not to pursue the *suicidal course* he seemed bent upon following.") (emphasis added). While I recognize that *Boria* is a pre-AEDPA case, I cite it here for a proposition unrelated to the standard of review.

[162] The complete failure to apply the first prong of a relevant, two-part standard enunciated by the Supreme Court (*i.e.,* the prejudice prong required by *Strickland*) represents an unreasonable application of Federal law.

[163] *Carrion*, 537 F. Supp. 2d at 518.

## D.    Remedy

When I first decided this case, I stated "A district court has considerable discretion in fashioning an appropriate remedy in a habeas proceeding."[164]  Citing *United States v. Day*,[165] I held that "[t]he appropriate remedy here is to give Carrion the benefit of the original plea offer and re-sentence him accordingly."[166]  But *Day* was a case brought pursuant to 28 U.S.C. § 2255 ("section 2255"), not section 2254.  Section 2255 permits a prisoner in federal custody to "move the court which imposed the sentence to vacate, set aside or correct the sentence."[167]  Section 2254, on the other hand, provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."[168]  Thus, it appears that section 2255 gives a district court a host of options not available under section 2254.

---

[164] *Id.* at 532.

[165] 969 F.2d 39, 47 (3d Cir. 1992).

[166] *Carrion*, 537 F. Supp. 2d at 533.

[167] 28 U.S.C. § 2255(a).

[168] 28 U.S.C. § 2254(a).

*Boria v. Keane*, was a case brought pursuant to section 2254.

Although *Boria* is a pre-AEDPA case, AEDPA did not alter in any way the

remedies that are available under 2254 and requires no deference to state courts in

this regard. In *Boria*, as here, Boria alleged that his trial counsel was ineffective.

However, *unlike* this case, Boria was not offered a plea deal that would have

allowed him to plead guilty to *fewer* counts than he faced at trial. Accordingly,

the *Boria* court did not vacate the conviction. And yet, because Boria had already

served a longer sentence than the *maximum* he could have received under the

rejected plea offer, the *Boria* court "order[ed] that the sentence be reduced to time

served and that the petitioner be discharged, but the judgment of conviction will

not be disturbed."[169] Thus, in effect, the *Boria* court ordered specific performance

of the plea deal with the goal of placing Boria in the position he would have

occupied had he accepted the plea.

　　　　Following *Boria*, I am ordering specific performance of the rejected

plea offer with the goal of placing Carrion in the position he would have occupied

had he accepted the offer. Because this case has a different fact pattern from

*Boria*, the result is different. Here, unlike *Boria*, the plea offer would have

allowed Carrion to plead guilty to only one count in the indictment, rather than the

---

[169] *Boria*, 99 F.3d at 499.

47

many counts he was convicted of at trial. Thus, if Carrion had accepted the plea

offer rather than going to trial, he would have been convicted *only* of possessing a

controlled substance in the first degree.[170] In order to give Carrion the benefit of

the plea deal, I vacate the counts of which he was convicted at trial but to which

he would not have pled guilty under the plea offer.[171] Thus, Carrion's only

remaining conviction is for possession of a controlled substance in the first degree.

Unlike Boria, however, Carrion has not served more time than he could have

served under the terms of the plea deal. Under the plea deal, Carrion would have

received an indeterminate sentence of ten years to life imprisonment. Thus, giving

Carrion the benefit of the plea deal, his sentence is reduced to that indefinite term

of ten years to life imprisonment. Carrion has been in prison for almost eighteen

years. Therefore, he should immediately be summoned to the Parole Board to

determine whether he is eligible for release in light of his newly imposed sentence.

**E.     Stay**

       After this Court granted Carrion's habeas petition, respondent moved

---

[170] *See Carrion*, 549 F.3d at 585.

[171] These counts are: criminal possession of a controlled substance in the first degree, five counts of attempted murder in the first degree, criminal use of a firearm in the first degree, two counts of criminal possession of a weapon in the third degree, and reckless endangerment in the first degree one count in the indictment.

48

for a stay pending appeal to the Second Circuit. After reviewing the "stay factors"

enunciated in *Hilton v. Braunskill*,[172] this Court stayed its Judgment, finding that

> upon Carrion's release from state custody, he will be
> detained by federal immigration authorities for a
> substantial period of time before he is deported. Thus, he
> will still be in custody, albeit in a different, and perhaps
> less favorable, venue while his case remains on appeal. If,
> on the other hand, Carrion is deported while his case is
> pending, there is a risk of flight from further
> reincarceration should the State prevail. The United States
> has only a limited extradition treaty with the Dominican
> Republic. It is therefore very difficult and costly, and
> sometimes impossible, to extradite a Dominican national.
> Finally, there is a strong public interest in not having the
> sentence of a violent felon, imposed in accordance with
> state law, modified by the actions of a federal district court
> until the Second Circuit has had an opportunity to address
> the constitutional challenge presented on appeal.[173]

In all likelihood, respondent will again appeal the decision granting Carrion's

petition and will inevitably move for a stay pending that appeal. In the interest of

efficiency, this Court hereby stays the instant Opinion and Order pending review

by the Second Circuit. In the absence of a timely appeal, the stay will

automatically be lifted.

---

[172] 481 U.S. 770, 774 (1987).

[173] *See Carrion v. Smith*, No. 04 Civ. 1034, 2008 WL 2622821, at *3 (S.D.N.Y. July 2, 2008).

49

## V.    CONCLUSION

For the reasons stated above, Carrion's petition for a writ of habeas corpus is granted.  The Clerk of the Court is directed to close this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             August 12, 2009

50

## - Appearances -

**For Petitioner:**

Marjorie M. Smith, Esq.
Law Office of Marjorie M. Smith
P.O. Box 234
Piermont, New York 10968
(845) 365-6335

**For Respondent:**

Mary C. Farrington
Deborah Hickey
Assistant District Attorneys
One Hogan Place
New York, New York 10013
(212) 335-9000